# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF OKLAHOMA

A.B., a minor child by and through
her Parent and Legal Guardian,
SHERRI BLAIK,

        Plaintiff,

v.

HEALTH CARE SERVICE
CORPORATION, d/b/a BLUE
CROSS BLUE SHIELD OF
OKLAHOMA,

        Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. CIV-14-990-D

## ORDER

A.B. is a minor child who has a neurological condition that requires intense therapy, including physical, occupational, speech and Applied Behavior Analysis (ABA) therapy. At the time of her birth, A.B.'s parents purchased a child's major medical health insurance policy issued by Defendant Health Care Service Corporation d/b/a Blue Cross Blue Shield of Oklahoma (BCBS). A.B., through her mother, Sherri,[1] filed this lawsuit, alleging BCBS breached the implied covenant of good faith and fair dealing by repeatedly delaying, refusing, denying, and otherwise

---

[1] For clarity and privacy, A.B. shall be referred to in this Order by her initials. Ms. Blaik shall be referenced as "Plaintiff."

mishandling A.B.'s claims and intentionally interfering with her ability to obtain benefits for appropriate medical care, specifically ABA and speech therapy.

Before the Court is BCBS's Motion for Summary Judgment [Doc. No. 65]. Plaintiff has filed her response in opposition [Doc. No. 73] and BCBS has replied [Doc. No. 77]. The matter is fully briefed and at issue.

## BACKGROUND

BCBS offers health insurance products in Oklahoma. In July 2008, BCBS issued a Health Check Select Policy ("the Policy") to A.B. shortly after her birth. Among other things, the Policy provided coverage for "Hospital Services," which included, but was not limited to, "therapy services." In addition, the Policy covered "Outpatient Therapy Services," which included, but was not limited to, "physical therapy," as well as "Outpatient Medical Services," which included, but was not limited to, "[v]isits and consultation for the examination, diagnosis, and treatment of an injury or illness."[2] To this end, the Policy stated "[b]enefits for Speech Therapy are limited to Inpatient services only." "Inpatient" was defined as "[a] Subscriber who receives care as a registered bed patient in a Hospital or other Provider where a room and board charge is made." The Exclusions section of the Policy stated BCBS would not provide coverage for "conditions related to autistic disease of childhood,

---

[2] BCBS's corporate representative testified there were other therapy services covered that were not expressly mentioned in the Policy.

hyperkinetic syndromes, learning disabilities, behavioral problems, mental retardation,[3] or Inpatient confinement for environmental change."

The Policy does not define "injury" or "illness." Under the Policy, "physical therapy" is defined as "the treatment by physical means, hydrotherapy, heat or similar modalities, physical agents, bio-mechanical and neuro-physiological principles, and devices to relieve pain, restore maximum function, and prevent disability following disease, injury, or loss of body part." "Speech therapy" is "treatment for the correction of a speech impairment resulting from disease, Surgery, injury, congenital and developmental anomalies, or previous therapeutic processes." Lastly, "occupational therapy" is defined as "treatment of a physically disabled person by means of constructive activities designed and adapted to promote the restoration of the person's ability to satisfactorily accomplish the ordinary tasks of daily living and those required by the person's particular occupational role."

A.B. experienced developmental problems at an early age. When she was only six months old, her parents noticed she was, among other things, having difficulty gaining weight and experiencing delays in her motor skills. A.B. was ultimately diagnosed, at the age of two, with hypoplasia of the corpus callosum ("HCC"), a congenital condition in which part of the brain between the two hemispheres—the

---

[3] Although the Policy uses this term, current medical nomenclature uses the term "intellectual disability." *See, e.g., Howell v. Trammell*, 728 F.3d 1202, 1206 n. 1 (10th Cir. 2013).

corpus callosum—is not fully developed.[4] As a result of her HCC, as indicated above, A.B. experiences physical delays, gross motor delays, and global developmental delays. She also has difficulty "crossing midline,"[5] using both hands at the same time, and experiences speech delays and physical body delays, which include walking and running. Although A.B.'s HCC affects the way she processes sound, she does not suffer from hearing loss.

Several types of therapy exist that may improve the behavioral and educational skills of one diagnosed with HCC. One such therapy, ABA, is an intensive one-on-one therapy designed to analyze a person's maladaptive behavior and eliminate those behaviors through repetitive performance of modified behaviors. ABA therapy utilizes positive reinforcement to encourage desired behavior. *See, e.g., A.F. v. Providence Health Plan*, 157 F. Supp. 3d 899, 904 (D. Or. 2016) (noting "ABA therapy is an intensive behavior therapy that, among other things, measures and evaluates observable behaviors."). It is often used as a therapy for children on the autism spectrum. *Id*.; *see also McHenry v. PacificSource Health Plans*, 679 F.

---

[4] The corpus callosum is a bundle of nerve fibers (over 200 million) that connect the two hemispheres of the brain and transmit information from the left to the right hemisphere. *See* National Organization for Disorders of the Corpus Callosum, http://nodcc.org/corpus-callosum-disorders/faq/ (last visited December 29, 2017).

[5] "Crossing midline" (or "crossing the midline") refers to one's ability to reach across the middle of the body, with the arms and legs crossing over to the opposite side.

Supp. 2d 1226, 1231 (D. Or. 2010) (identifying ABA therapy as one of many treatments focusing primarily on addressing the developmental impairments caused by autism). A.B. receives ABA therapy to help improve her HCC-related symptoms. She also receives outpatient speech therapy to address her speech delay.

In 2011, when A.B. was about three years old, Plaintiff submitted two claims for ABA therapy, but BCBS denied them on the basis they were not covered under the Policy.[6] Notes produced by BCBS during discovery indicated the claims were denied on the belief A.B. was autistic. The notes stated, "[t]his [member] is not autistic and it looks like the [claims] are denying for that reason[.]" In support of her appeal of the coverage decision, Plaintiff produced correspondence from her treating physician, which stated in relevant part:

> [A.B.] was diagnosed with [HCC], a neurological condition in April 2010. It is medically necessary that [A.B.] receive intense therapy, including physical, occupational, speech and Applied Behavior Analysis (ABA) therapy so that she may overcome cognitive and speech deficiency to permit a more normal life. *She does not have Autism or any other mental health issues.* … She has recently begun ABA therapy and there have been significant improvements in her ability to communicate, thus proof that this type of therapy works and is medically necessary for [A.B.]. (Emphasis added.)

---

[6] The Policy required that "proper notice" of an insurance claim be submitted before BCBS became responsible under the agreement, and set forth a claims handling procedure for the submission and processing of claims. The Policy reserved the right to seek recoupment of payments in the event such payments were deemed erroneous. Once the aforementioned claims were denied, Plaintiff stopped submitting additional claims for ABA therapy.

Nonetheless, BCBS upheld its denial of the claims.

Beginning in 2012, BCBS initially paid Plaintiff's claims for A.B.'s speech therapy based on its interpretation of the Oklahoma Audiology Mandate, 36 OKLA. STAT. § 6060.7(A)(1) ("the Audiology Mandate"), which provided that any health benefit plan must "provide coverage for audiological services and hearing aids for children up to eighteen (18) years of age." However, in 2014, it reviewed its interpretation of the statute and stopped paying claims submitted after April 2014 on the grounds that, in its view, outpatient speech therapy was not covered. BCBS did not inform Plaintiff of its change in interpretation and there is no evidence in the record as to what either interpretation specifically stated. BCBS did pay some speech therapy claims submitted in the latter portion of 2014; however, BCBS contends this was based on an erroneous application of its former interpretation of the Audiology Mandate. BCBS later amended the Policy to include outpatient speech therapy as a covered benefit for services beginning in 2015. Speech therapy claims were limited to a combined twenty-five claims per year for physical therapy, occupational therapy, and speech therapy.

## STANDARD OF DECISION

Rule 56(a), Federal Rules of Civil Procedure, provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The

Court views the material undisputed[7] facts in the light most favorable to the non-moving party. *T.D. v. Patton*, 868 F.3d 1209, 1219 (10th Cir. 2017). The Court's function at the summary judgment stage is not to weigh the evidence and determine the truth of the matter asserted, but to determine whether there is a genuine issue for trial. *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015). An issue is "genuine" if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. *Id*.

Once the moving party has met its burden, the burden shifts to the nonmoving party to present sufficient evidence in specific, factual form to establish a genuine factual dispute. *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991). The nonmoving party may not rest upon the mere allegations or denials of its pleadings. Rather, it must go beyond the pleadings and establish, through admissible evidence, that there is a genuine issue of material fact that must be resolved by the trier of fact. *Salehpoor v. Shahinpoor*, 358 F.3d 782, 786 (10th Cir.

---

[7] To determine which facts are not in genuine dispute, the Court must disregard any unsupported allegations, legal conclusions, or legal arguments couched as facts that appear in either party's statement of material facts or response thereto. *See, e.g., Chavez v. County of Bernalillo*, 3 F. Supp. 3d 936, 949 n. 4 (D.N.M. 2014).

2004). Unsupported conclusory allegations do not create an issue of fact. *Finstuen v. Crutcher*, 496 F.3d 1139, 1144 (10th Cir. 2007).

## DISCUSSION

Subject matter jurisdiction for this action is predicated upon diversity of citizenship. *See* Compl. ¶¶ 1-2 [Doc. No. 1]. Therefore, the issues before the Court require consideration of Oklahoma law as well as the Policy language. *State Farm Fire and Casualty Co. v. Pettigrew*, 180 F. Supp. 3d 925, 931 (N.D. Okla. 2016) ("The interpretation of an insurance contract is governed by state law and, sitting in diversity, we look to the law of the forum state.") (quoting *Houston Gen. Ins. Co. v. Am. Fence Co., Inc.*, 115 F.3d 805, 806 (10th Cir. 1997)).[8] Under Oklahoma law, interpretation of an insurance policy, like any written contract, presents a question of law. *May v. Mid-Century Ins. Co.*, 2006 OK 100, ¶ 22, 151 P.3d 132, 140.

Oklahoma's rules of construction for insurance policies are the same as those for other contracts:

> An insurance policy is a contract. The rules of construction and analysis applicable to contracts govern equally insurance policies. The primary goal of contract interpretation is to determine and give effect to the intention of the parties at the time the contract was made. In arriving at the parties' intent, the terms of the instrument are to be given their plain and ordinary meaning. Where the language of a contract is clear and unambiguous on its face, that which stands expressed within its four corners must be given effect. A contract should receive a construction

---

[8] Neither party questions that the Policy here is to be interpreted under Oklahoma law.

that makes it reasonable, lawful, definite and capable of being carried into effect if it can be done without violating the intent of the parties.

*May*, 151 P.3d at 140 (citations omitted); *State Ins. Fund v. Ace Transp. Inc.*, 195 F.3d 561, 564 (10th Cir. 1999) (applying Oklahoma law); *see also* 15 OKLA. STAT. § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.").

"[I]nsurance contracts are contracts of adhesion because of the uneven bargaining position of the parties. Consequently, in the event of ambiguity[9] or conflict in the policy provisions, a policy of insurance is to be construed strictly against the insurer and in favor of the insured." *Spears v. Shelter Mut. Ins. Co.*, 2003 OK 66, ¶ 5, 73 P.3d 865, 868. In such an event, exclusionary provisions are narrowly construed against the insurer and words of inclusion are construed in favor of the insured. *See id.; Orthopedic Resources, Inc. v. Nautilus Ins. Co.*, 654 F. Supp. 2d 1307, 1313 (N.D. Okla. 2009) ("Under Oklahoma law, exclusionary provisions in an insurance contract are narrowly construed and 'words of exclusion are construed against the insurer and words of inclusion are construed in favor of the insured.'")

---

[9] The absence of an express definition of a word or phrase within the policy does not necessarily render it ambiguous. Rather, the test to be applied in determining whether a word or phrase is ambiguous is whether the term is reasonably susceptible to two interpretations on its face. *Cranfill v. Aetna Life Ins. Co.*, 2002 OK 26, ¶ 7, 49 P.3d 703, 706. "This test for ambiguity is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer." *See id.* (citing *Couch on Insurance* 3d § 21:14 (1995)).

(quoting *Timmons v. Royal Globe Ins.*, 1982 OK 97, ¶ 20, 653 P.2d 907, 913). The Court should not focus on a particular clause or take language out of context. *Shawnee Hosp. Auth. v. Dow Constr., Inc.*, 1990 OK 137, ¶ 6, 812 P.2d 1351, 1353. If an insurance policy contains no ambiguity, the Court must construe its language in accordance with the plain, ordinary meaning of its terms. *Haworth v. Jantzen*, 2006 OK 35, ¶ 17, 172 P.3d 193, 197. Here, neither party argues that the applicable Policy provisions are ambiguous, but the parties advance divergent views regarding the scope of coverage based on that Policy language. The mere fact that the parties disagree or press for a different construction does not make a contract ambiguous. *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 2003 OK 5, ¶ 12, 63 P.3d 541, 545.[10]

Plaintiff asserts only one claim—breach of the implied covenant of good faith and fair dealing. "Under Oklahoma law, '[e]very contract ... contains an implied duty of good faith and fair dealing.'" *Combs v. Shelter Mutual Ins. Co.*, 551 F.3d 991, 998-99 (10th Cir. 2008) (quoting *Wathor v. Mutual Assurance Administrators, Inc.*, 2004 OK 2, ¶ 5, 87 P.3d 559, 561). To that end, "[a]n insurer has an 'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy

---

[10] Even where an ambiguity is found, if the ambiguity results from the words used (a patent ambiguity), as opposed to some extrinsic fact (a latent ambiguity), the construction of the contract remains a question of law for the Court. *Walker v. Telex Corp.*, 1978 OK 13, ¶ 7, 583 P.2d 482, 485; *Paclawski v. Bristol Labs., Inc.*, 1967 OK 21, ¶ 24, 425 P.2d 452, 455; *Shepherd v. French*, 1980 OK CIV APP 13, ¶ 10, 612 P.2d 727, 729.

benefits are received.'" *Badillo v. Mid Century Ins. Co.*, 2005 OK 48, ¶ 26, 121 P.3d 1080, 1093 (citing *Christian v. American Home Assurance Co.*, 1977 OK 141, ¶ 8, 577 P.2d 899, 901). "Under Oklahoma law, 'the essence of the intentional tort of bad faith with regard to the insurance industry is the insurer's unreasonable, bad-faith conduct,[11] including the unjustified withholding of payment due under a policy.'" *Boggs v. Great Northern Ins. Co.*, 659 F. Supp. 2d 1199, 1216 (N.D. Okla. 2009) (quoting *McCorkle v. Great Atlantic Ins. Co.*, 1981 OK 128, ¶ 21, 637 P.2d 583, 587). "[I]f there is conflicting evidence from which different inferences may be drawn regarding the reasonableness of insurer's conduct, then what is reasonable is always a question to be determined by the trier of fact by a consideration of the circumstances in each case." *Badillo*, 121 P.3d at 1093 (quoting *McCorkle*, 637 P.2d at 587). "A central issue in any analysis to determine whether breach has occurred is gauging whether the insurer had a good faith belief in some justifiable reason for the actions it took or omitted to take that are claimed violative of the duty of good faith and fair dealing." *Id*. (citing *Buzzard v. McDanel*, 1987 OK 28, ¶ 10, 736 P.2d 157, 159).

---

[11] "Bad faith," for purposes of the tort, has been described as "willful, malicious, or oppressive for the purposes of delaying or avoiding payment of the insured's claim." *Tolman v. Reassure America Life Ins. Co.*, 2017 OK CIV APP 15, ¶ 15, 391 P.3d 120, 123 (citing *Christian*, 577 P.2d at 905).

In sum, the elements of Plaintiff's bad faith claim are: (1) BCBS was required under the Policy to pay her ABA and speech therapy claims; (2) BCBS's refusal to pay the claims was unreasonable under the circumstances because it either (a) did not perform a proper investigation, (b) did not evaluate the results of the investigation properly, or (c) had no reasonable basis for the refusal; (3) BCBS did not deal fairly and in good faith with Plaintiff; and (4) BCBS's violation of its duty of good faith and fair dealing was the direct cause of the damages sustained by Plaintiff and sought to be recovered in this action. *See Bannister v. State Farm Mut. Auto Ins. Co.*, 692 F.3d 1117, 1126-27 (10th Cir. 2012); *see also Badillo*, 121 P.3d at 1093.

## I.    ABA Therapy

BCBS' Motion with respect to Plaintiff's claims for ABA therapy is threefold. First, it contends Plaintiff cannot recover any damages for the cost of ABA therapy services not submitted as part of a claim; therefore, its duty of good faith and fair dealing is limited only to the two claims submitted by Plaintiff. Second, Defendant contends ABA therapy is not covered under the Policy. Third, Defendant states that even assuming ABA therapy was covered, it legitimately disputed coverage for such treatment. The Court addresses each argument in turn.

## A. Submission of Claims

It is undisputed that only two claims for ABA therapy were submitted to Defendant. Plaintiff, however, argues that because Defendant refused to pay the initial claims, any further attempts to obtain coverage would have been futile. Plaintiff also argues that Defendant's material breach of the Policy excused any further obligation on her behalf to submit additional claims. Although it is generally true that an insurer's duty of good faith and fair dealing is triggered upon a notice of claim, *Timmons*, 653 P.2d at 913, the law does not require the performance of futile acts. *Cf. Apache Corp. v. State, ex rel. Oklahoma Tax Comm'n*, 2004 OK 48, ¶ 9, 98 P.3d 1061, 1063 (noting that Oklahoma law "does not require one to do a vain or useless thing or to perform an unnecessary act to obtain relief.") (citations omitted).

Here, the Court finds Plaintiff can establish futility because (1) Plaintiff sought coverage for ABA treatment and was denied twice on the basis that it was not covered under the Policy, and (2) there is no evidence in the record that BCBS either voluntarily paid benefits for ABA therapy or communicated its willingness to do so. *Compare A.F. v. Providence Health Plan*, 157 F. Supp. 3d 899, 909 (D. Or. 2016) (plaintiff could demonstrate exhaustion futility where, among other things, the defendant had not "identified any instance in which it willingly paid for ABA therapy[.]"); *Potter v. Blue Cross Blue Shield of Mich.*, No. 10-cv-14981, 2011 WL 9378789, at *3 (E.D. Mich. July 14, 2011) (plaintiff successfully demonstrated

13

exhaustion futility where the defendant "ha[d] not identified one instance in which it has voluntarily paid benefits for ABA treatment").

By its own admission in this case, BCBS refused to pay all claims for ABA therapy since BCBS determined it was not a covered service under the terms of the Policy. No evidence in the record reflects a change in its position. BCBS asserts that claims for the denied ABA therapy were required to be repeatedly submitted, over and over again, despite its no-coverage decision. Such a requirement, under the circumstances here, would result in the same absurdity BCBS attempts to ascribe to Plaintiff's litigation position. The Court finds Plaintiff has carried her burden to show that submission of additional claims would have been futile. Therefore, her failure to submit additional claims for ABA therapy does not bar review of BCBS's denials.

### B. *Coverage for ABA Therapy*

Whether the Policy provides coverage for ABA therapy is a legal issue for the Court to decide. *Automax Hyundai South, L.L.C. v. Zurich Am. Ins. Co*., 720 F.3d 798, 804 (10th Cir. 2013) (citing *Dodson v. St. Paul Ins. Co*., 1991 OK 24, ¶ 12, 812 P.2d 372, 376). The Policy purports to exclude treatment for "conditions related to autistic disease of childhood, hyperkinetic syndromes, learning disabilities, behavioral problems, mental retardation, or Inpatient confinement for environmental change," yet at the same time it provides coverage for "physical therapy" and

14

"outpatient services," which are designed to ameliorate and provide visits and consultation for the "examination, diagnosis, and treatment of an injury or illness."[12] Thus, these provisions of the Policy are in apparent conflict.

BCBS's contention that ABA treatment is expressly excluded by the Policy is unpersuasive. ABA treatment or therapy is nowhere specifically mentioned in the Policy and BCBS's reading of the exclusion in question is strained. BCBS asserts that HCC is a "condition related to" the enumerated syndromes and symptoms in the exclusion on page forty-nine of the Policy; but clearly, HCC *is the underlying illness or condition* which is manifested in A.B. in myriad ways, *some* of which are behavioral. Moreover, BCBS's argument that because the ABA treatment is in part sought to alleviate A.B.'s developmental challenges it falls into the excluded categories of treatment for learning disabilities, behavioral problems, or mental retardation is so elastic that it could be stretched to engulf the effects of almost any illness or condition that in part manifests itself through undesirable behaviors. However, such exclusionary language must be construed narrowly. BCBS's position does not survive this narrow construction.

BCBS initially denied Plaintiff's claims on the basis A.B. was autistic. Evidence submitted by Plaintiff revealed A.B. was not suffering from autism or any

---

[12] Webster's defines "illness" as "an unhealthy condition of body or mind." MERRIAM-WEBSTER ONLINE DICTIONARY, available at https://www.merriam-webster.com/dictionary/illness (last visited December 15, 2017).

mental illness, but was diagnosed with the neurological condition HCC, and it was medically necessary that she receive physical therapy, occupational therapy, speech therapy, and ABA therapy so that she may overcome cognitive, motor, and speech deficiencies. As mentioned, the Policy is silent with respect to ABA therapy, but this of course does not necessary militate in favor of a no-coverage determination—there are hundreds of established courses of medical treatment and therapies, and an insurance policy attempting to specifically enumerate all of them would be unreadable. Both parties agree that HCC is an extremely rare condition without an established treatment protocol; it comes as no surprise then that neither HCC nor ABA therapy are expressly mentioned in the Policy. But the Policy does provide coverage for "Outpatient Medical Services," which includes "Home, Office, and other Outpatient visits," expressly including "visits and consultation for the examination, diagnosis, and treatment of an injury or illness." *See* Policy at p. 27 [Doc. No. 65-1]. Similarly, the Policy specifically provides coverage for "Outpatient Therapy Services," which include "Physical Therapy and Occupational Therapy." *See id.* at pp. 29-30.[13]

---

[13] "Therapy Service" is defined as a group of enumerated services when ordered by a physician and used to "treat and promote your recovery for an *illness* or injury." Policy at p. 74 (Emphasis added). "Physical Therapy" is defined as "the treatment by *physical means*, hydrotherapy, heat, or similar modalities, physical agents, bio-mechanical and *neuro-physiological principles*, and devices to relieve pain, restore maximum function, and prevent disability following disease, injury, or loss of body part." *Id*. (Emphasis added). The Policy defines "Occupational Therapy," in

16

Although the ABA regimen includes therapies to assist A.B. with academic and social deficits, it involves physical components as well, including therapies to develop fine and gross motor skills, and comprehensively seeks to address issues identified by occupational and physical therapists. The various treatment goals are aggregated by A.B.'s Board Certified Behavior Analyst, and incorporated into her ABA program. *See* Depo. of Sherri Blaik at 69-71, Ex. 12 to Pl. Resp. to Mot. for Summ. J [Doc. No. 73-12]. ABA therapy, although not specifically addressed in the Policy, shares critical components of what is commonly understood (and defined in the Policy) as physical and occupational therapy provided on an outpatient basis. Construing words of inclusion regarding such therapies in favor of the insured, *Spears*, 73 P.3d at 868, the Court readily finds that ABA therapy belongs in the same category.

The Court thus concludes that ABA therapy falls within provisions extending coverage for "outpatient services," "physical therapy," and "occupational therapy" for "treatment of an injury or illness." A.B.'s HCC is certainly an "illness" –an unhealthy condition of the body—and ABA therapy is clearly an outpatient treatment for such illness.

---

pertinent part, as "treatment of a physically disabled person by means of constructive activities designed and adapted to promote the restoration of the person's ability to satisfactorily accomplish the ordinary tasks of daily living …." *Id*. at 75.

## C.    Reasonableness of Denial

Having construed the Policy's conflicting terms in favor of coverage, the Court turns to the question of whether BCBS's denial was reasonable. The applicable standard on this issue is well-known and oft repeated:

> The Oklahoma Supreme Court and this Court have made clear that an insurer does not subject itself to a claim of bad faith merely by disputing coverage. The insurer does not breach the duty of good faith by refusing to pay a claim or by litigating a dispute with its insured if there is a legitimate dispute as to coverage or amount of the claim, and the insurer's position is reasonable and legitimate. So long as there is a legitimate basis for doing so, disputing coverage is not bad faith per se. We note, though, that a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith. An insured may pursue a claim of bad faith even where the insurer has a legitimate defense to coverage. However, in order to pursue such a claim, the insured must present sufficient evidence reasonably tending to show bad faith. … In sum, in order to establish [a bad faith] claim, the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim.

*Timberlake Constr. Co. v. U.S. Fid. and Guar. Co*., 71 F.3d 335, 343-44 (10th Cir. 1995) (internal citations and quotations omitted). "Whether an insurer's actions reasonably give rise to an inference of bad faith must be determined in light of all facts known or knowable concerning the claim at the time plaintiff requested the company to perform its contractual obligation." *Oulds v. Principal Mut. Life Ins. Co*., 6 F.3d 1431, 1439 (10th Cir. 1993) (citing *Conti v. Republic Underwriters Ins. Co*., 1989 OK 128, ¶ 20, 782 P.2d 1357, 1362).

BCBS contends there was a legitimate dispute concerning coverage because (1) ABA therapy is not an enumerated treatment in the Policy, (2) the Policy excludes coverage for ABA therapy, (3) A.B.'s condition was rare, and (4) there is no standard treatment for a child diagnosed with HCC.

Viewing the evidence and all reasonable inferences in the light most favorable to Plaintiff, the aforementioned considerations lead the Court to conclude that the issue of BCBS's compliance with its duty of good faith is a question of fact best left for the jury. To support her contention that BCBS acted unreasonably, Plaintiff cites evidence in the record indicating that BCBS denied claims for symptoms it associated with autism, despite a physician's statement that she was not autistic. Yet, when presented with this contrary evidence, BCBS remained steadfast in its denial of Plaintiff's claims.

Although BCBS contends ABA therapy is not specifically enumerated in the Policy, its corporate representative testified that BCBS has provided coverage for therapies not specifically listed in Policy provisions. In addition, the Court has concluded, in light of the Policy's conflicting terms, that the Policy provides coverage for ABA therapy. BCBS asserts the Policy excludes coverage for conditions related to autistic disease of childhood, hyperkinetic syndromes, learning disabilities, behavioral problems, "mental retardation," or Inpatient confinement for environmental change treatment. However, the Court has determined that ABA

therapy is not excluded by the Policy's language. Lastly, the uniqueness of A.B.'s condition is of no consequence at the summary judgment stage, since all reasonable inferences must be viewed in Plaintiff's favor, and the existence of a unique illness could just as easily support a conclusion that Plaintiff's claims should have been covered. Accordingly, BCBS's Motion is denied on this issue.

## II.    Speech Therapy

BCBS contends Plaintiff cannot establish bad faith regarding the denial of her speech therapy claims post-April 2014 because (1) the Policy did not cover outpatient speech therapy and (2) even assuming speech therapy was covered, there was a legitimate dispute regarding coverage for such services. Plaintiff responds that (1) BCBS is estopped from denying coverage for speech therapy, and (2) speech therapy  was covered under the Affordable Care Act's (ACA) "habilitative" services mandate.

In the Court's view, the record raises a genuine issue of fact concerning whether BCBS should be estopped from denying Plaintiff's claims for speech therapy during the relevant period.[14] Estoppel bars a party from alleging or denying certain rights which might otherwise have existed because of the party's voluntary

---

[14] In this regard, the Court finds that the ACA does not apply to the Policy. With certain exceptions not applicable here, the ACA exempts from its provisions plans executed on or before March 23, 2010. *See* 42 U.S.C. § 18011. It is undisputed that Plaintiff's Policy was issued in 2008.

conduct. *Sullivan v. Buckhorn Ranch P'ship*, 2005 OK 41, ¶ 31, 119 P.3d 192, 201. It is used to prevent injustice and should not be used to work a positive gain to a party. *Id*. Moreover, estoppel requires good faith reliance upon a representation or position by the party asserting it. *Id*. The essential elements of estoppel are: (1) a false representation or concealment of facts, (2) which was made with actual or constructive knowledge of the real facts, (3) the party to whom it was made must have been without knowledge, or the means of discovering the real facts, (4) the act or concealment must have been made with the intention that it should be relied or acted upon, and (5) the party to whom it was made relied on, or acted upon it to their detriment. *Id*. Where material facts are in dispute, the issue of estoppel is a question of fact that cannot be determined by summary judgment. *See, e.g., Sunrizon Homes, Inc. v. American Guar. Inv. Corp.*, 1988 OK 145, ¶¶ 13-14, 782 P.3d 103, 108; *see also T.V. ex rel. Villnave v. Columbia Nat. Ins. Co.*, 2013 OK CIV APP 100, ¶ 21, 313 P.3d 1022, 1027 ("Where the facts are *not disputed and are subject to only one interpretation*, the question of estoppel becomes one of law to be decided by the court.") (Emphasis added).

Viewing the evidence—and all reasonable inferences—in Plaintiff's favor, BCBS consistently paid her speech therapy claims on the grounds such services were compensable under Oklahoma law. However, BCBS ceased making payments based on an arbitrary change in its interpretation of the law and failed to communicate that

change to Plaintiff. Plaintiff was nonetheless repeatedly informed that coverage for speech therapy existed, any denial of benefits was mistaken, and wrongly denied claims would be reopened and paid. As a result, Plaintiff continued to obtain speech therapy for A.B. A reasonable trier of fact could determine that BCBS's unilateral change in position and decision not to pay further claims for speech therapy was an intentional effort to avoid payment of A.B.'s claims, and it should be estopped from doing so. Accordingly, BCBS's Motion is denied on this ground.

## III. Punitive Damages

Finally, BCBS moves for summary judgment on Plaintiff's prayer for punitive damages. Punitive damages are not an independent cause of action, but a form of relief dependent on Plaintiff's other claims. *Cf. Douglas v. Miller*, 864 F. Supp. 2d 1205, 1220 (W.D. Okla. 2012). Pursuant to 23 OKLA. STAT. § 9.1, punitive damages may be available in a bad faith suit where the insurer has either (1) recklessly disregarded its duty to deal fairly and act in good faith with its insured; (2) intentionally and with malice breached its duty to deal fairly and act in good faith with its insured; or (3) intentionally and with malice breached its duty to deal fairly and act in good faith with its insured, and the Court finds that, beyond a reasonable doubt, the insurer acted intentionally and with malice and engaged in life-threatening conduct. *Id*. Submission of punitive damages to a jury may be improper even where there is evidence to support an award of actual damages. *LeBlanc v. Travelers Home*

*and Marine Ins. Co.*, No. CIV-10-503-HE, 2011 WL 2748616, at *5 (W.D. Okla. July 13, 2011).

Based on its findings regarding the reasonableness of BCBS's conduct, the Court finds that whether such conduct constitutes any of the aforementioned categories of conduct warranting the imposition of punitive damages cannot be determined as a matter of law based on the instant summary judgment record. The record before the Court does not sway the Court in either direction as to whether the issue of punitive damages will be presented to the jury; hence, any ruling on the issue of punitive damages is premature.

## CONCLUSION

BCBS's Motion for Summary Judgment [Doc. No. 65] is **DENIED** as set forth herein.

**IT IS SO ORDERED** this 12ᵗʰ day of February 2018.

_____
TIMOTHY D. DeGIUSTI
UNITED STATES DISTRICT JUDGE